UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JILL DAVIS,

      Plaintiff,

                                        Case No. 1:24-cv-199

v.

                                        Hon. Hala Y. Jarbou

KALAMAZOO PUBLIC SCHOOLS, et al.,

      Defendants.
_____/

## OPINION

Plaintiff Jill Davis filed this lawsuit claiming Defendants Kalamazoo Public Schools ("KPS") and the Kalamazoo Public Schools Board of Education violated her rights under the Americans with Disabilities Act ("ADA"). (Compl., ECF No. 1.) She claims Defendants failed to provide reasonable accommodations for her disability, discriminated against her due to her disability, and retaliated against her for requesting an accommodation. Before the Court is Defendants' motion for summary judgment. (ECF No. 34.) For the reasons discussed herein, the Court will grant in part and deny in part Defendants' motion.

## I. BACKGROUND

Davis started working for KPS as a kindergarten teacher at the beginning of the 2019-2020 school year. (Davis Dep. 24, ECF No. 35-2.) Due to the COVID pandemic, Davis—along with all other teachers at KPS—were teaching remotely from their respective homes by the end of the school year. (*Id.* at 33, 39.) In August 2020, as KPS began planning for the 2020-2021 school year, Davis disclosed to KPS that she was immunocompromised and requested a remote (at-home) teaching placement due to her medical conditions. (*Id.* at 39-40.) KPS granted this request and

shifted Davis to teaching second and third grade students as part of KPS's virtual program. (*Id.* at 37, 41.) She taught the entire 2020-2021 school year from home. (*Id.* at 37, 202.) While KPS planned to bring other teachers back for in-person educational instruction during that school year, the plan never materialized; all KPS teachers taught from home during the 2020-2021 school year. (*Id.* at 202; Emmons Dep. 32, ECF No. 35-4; Leland Dep. 22, ECF No. 35-27.)

As KPS started to prepare for the 2021-2022 school year, Davis once again requested workplace accommodations. (*Id.* at 43-45.) She emailed Dan Emmons, a Compliance Specialist at KPS who handled ADA accommodations requests (Emmons Dep. 10, 15), asking to continue her virtual placement. (Davis Dep. 43-45.) Davis included notes from her medical providers suggesting KPS allow Davis to teach "virtually with limited face-to-face contact with unvaccinated children" due to her diagnosis of left breast invasive ductal carcinoma. (*Id.* at 43-45, 46-49, 163.) She also filled out an ADA Accommodation Request form. (*Id.* at 46.)

In response to her request, KPS kept Davis in the virtual program for the 2021-2022 school year. Davis did not provide any in-person instruction to students, and she did not proctor any in-person exams. (*Id.* at 62, 64, 66.) However, instead of teaching from home, she taught virtually from a classroom within the Oakwood Center, a KPS building. (*Id.* at 50-51.) Davis shared her classroom space at Oakwood with another teacher (*id.* at 85), and, on occasion, the school's secretary would bring students to her classroom for visiting purposes. (*Id.* at 51-52, 56-57.) Other students, in grades six through twelve, were also present in the Oakwood building. (*Id.* at 163.) It is unclear whether the students at Oakwood were vaccinated or unvaccinated. (*Id.* at 53, 163; Kirshman Dep. 61.) At some point during the 2021-2022 school year, Davis contracted COVID. (Davis Dep. 176-77; Kirshman Dep. 119-21.)

Not everyone within KPS felt the virtual program operated smoothly.  Kim Kirshman—the administrator for Oakwood who also oversaw elements of KPS's virtual programs (Kirshman Dep. 14-15)—expressed concerns that students in the virtual program were not getting enough support.  (*Id.* at 70-78, 163-68.)  She questioned whether providing these virtual opportunities for students was worth it, and emailed KPS administrators expressing opposition to accommodations for virtual teachers.  (*Id.*)  However, none of the students (or parents of students) in the virtual program raised any issues or asked for additional support or resources.  (*Id.*)

Nonetheless, Kirshman resisted virtual education.  Despite having the authority to approve teachers' work-from-home requests, she was reluctant to do so.  (*Id.* at 48, 50-51.)  When Davis asked for additional time to teach from home during her recovery from COVID, Kirshman refused, signaling to administrators that teachers were abusing work-from-home requests.  (*Id.* at 119-31.)  And even though Kirshman acknowledged the possibility of approving long-term remote work due to medical necessity, she never did so for Davis.  (*Id.* at 98-101.)  Instead, once Kirshman became aware of the extent to which some teachers had virtual accommodations that limited face-to-face interactions with students, she insinuated that the school should consider no longer providing such accommodations.  (*Id.* at 70-78, 163-68.)  Kirshman also suggested that it may be best for KPS if Davis and other teachers who received virtual accommodations took FMLA leave so other teachers would not have to fill in when it came to in-person responsibilities (i.e. proctoring exams), and she asked about whether KPS could no longer provide ADA accommodations.  (*Id.* at 72, 104.)  Kirshman's concerns about virtual work did not change how KPS operated over this period; some teachers who filled substitute roles or contract-based positions with the district worked fully remote, teaching from their homes.  (*E.g.*, *id.* at 30-31; Davis Dep. 132-33.)  And Davis continued to work virtually.

3

On April 11, 2022, KPS started making plans for the following school year's virtual program.  (Davis Dep. 66-67.)  In an email exchange, Kirshman explained to Davis that there would be two positions for virtual elementary teachers for the 2021-2022 school year.  (*Id.* at 66-67.)  Davis expressed interest, and to ensure she maintained her accommodations, she submitted a letter from her doctor (Timothy Gatz) to Emmons explaining that it was medically necessary for Davis to have remote virtual teaching accommodations.  (*Id.* at 73-76.)  While Davis did not submit an official ADA Accommodation Request form, as she had done in the past, Emmons treated her emails with doctor notes attached as ADA requests.  (Emmons Dep. 46, 58, 63-64.)  KPS assigned Davis to one of the virtual elementary school teaching positions (Davis Dep. 66-67), but rather than report to Oakwood to provide virtual instruction, she would teach from a room at the Winchell Elementary building, another KPS property.  (*Id.* at 70.)  Even though there were plenty of open spaces throughout KPS's many facilities, administrators decided to move the program to Winchell Elementary, a building that had limited space.  (D'Arcangelis Dep. 19-23, ECF No. 42-22.)

For the 2022-2023 school year, Davis was assigned kindergarten through third grade for the virtual program.  (Davis Dep. 71.)  When the school year started, all staff were supposed to report in person for a welcome meeting.  (*Id.* at 80-82.)  Davis asked to attend virtually and was granted that request.  (*Id.*)  Davis was able to attend all staff meetings, personal development meetings, and other faculty activities virtually with the exception of an ice cream social, which she attended in person despite requesting an accommodation.  (*Id.* at 91, 93-95.)  Winchell's administrator, Judy D'Arcangelis, was not aware of Davis's accommodations at the time she denied Davis's request to not attend the ice cream social in person.  (*Id.* at 94.)

In September 2022, Davis sent Emmons an email with an updated request; she included a letter from Aki Morikawa (one of Davis's medical providers) stating the Davis has "a new

4

diagnosis of breast cancer," and "[i]n order to avoid COVID exposure risk, . . . she [should] be allowed to work from home in her virtual teaching capacity until after her definitive surgery is completed." (*Id.* at 96.)  Tom Greig, a representative for the teachers' union, followed up to Davis's email explaining that Davis's situation at Winchell was "untenable." (*Id.* at 98-99.)  Greig discussed the septic backup, disturbing smell, and black mold present in Davis's classroom space. (*Id.* at 100.)  While D'Arcangelis allowed Davis to use other spaces in the building, this did not alleviate Greig's concerns.  (*Id.* at 99-100.)  In an effort to limit her exposure to the smell and mold in her classroom space, while simultaneously avoiding students in the building, Davis resorted to a nomadic approach to teaching; she would try to use the computer lab, conference rooms, or any other space available to teach with proper social-distancing, finishing some days teaching from her car. (*Id.* at 101.)  Davis continued to work with KPS on finding a better situation.  Davis was under the impression that she would be able to work remotely (from home) a couple days each week, however KPS never made that option available in these discussions. (*Id.* at 104, 111.)

KPS eventually came up with a new arrangement.  On December 8, 2022, KPS informed Davis that she would move back to Oakwood and teach virtually from a room in that building.  (*Id.* at 115-17.)  Even though Kirshman was the administrator for Oakwood, D'Arcangelis would continue to serve as the administrator Davis worked under.  (*Id.*)  While Davis was excited to have a permanent space to teach from at Oakwood, the following day, December 9, 2022, Davis informed Emmons that she would need to take medical leave under the Family and Medical Leave Act ("FMLA").  (*Id.* at 117, 120-21.)  Davis was scheduled to have imminent medically necessary surgery, and her leave would need to start on December 14, 2022.  (*Id.*)  She anticipated returning to work in mid-February 2023.  (*Id.* at 121.)  Emmons approved her FMLA leave shortly after her request.  (*Id.* at 121-22.)

After weeks of FMLA leave, Davis sent Emmons an email on February 9, 2023 informing KPS that she planned to return to teaching the following Monday, February 13, 2023.  (*Id.* at 122.) Davis attached two doctors' notes to this email.  The first note was from Dr. Morikawa explaining that due to Davis's breast cancer, she should be allowed to teach from a workstation at her home. (*Id.* at 123.)  The second note was from Dr. Gatz stating that it was necessary for Davis to "have a remote virtual teaching accommodation."  (*Id.*)  Taken together, KPS interpreted these medical provider notes as a request for Davis to teach from her home due to medical necessity, but Emmons (on behalf of KPS) responded saying "the only path forward" would be for Davis to work out of a school building.  (*Id.* at 135-36; Emmons Dep. 68, 81-82.)  Negotiations broke down and Davis remained on FMLA leave for the remainder of the 2022-2023 school year.  (Davis Dep. 144.)

Davis would never return to her position at KPS.  While never technically fired or terminated, on August 22, 2023, KPS notified Davis that due to low enrollment (Leland Dep. 63-64), the virtual program for kindergarten through second grade would be discontinued for the 2023-2024 school year.  (Davis Dep. 144-45.)  Davis was officially displaced from her position. (*Id.* at 151.)  Kirshman was not involved in that decision.  (Kirshman Dep. 171.)

Because Davis requested fully remote work as a medically necessary post-FMLA accommodation, and KPS asserts that such accommodation is not possible, she remains displaced. Davis has not yet resigned or retired from KPS.  (Davis Dep. 145-46.)  KPS asserts that it can find her a position once she officially returns from FMLA leave.  (Leland Dep. 94-95.)  Davis receives Social Security Disability Insurance ("SSDI") as a "totally disabled" individual.  (Davis Dep. 11-14).

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  The party moving for summary judgment bears the burden of demonstrating that there is

no genuine dispute of material facts.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact

is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).  A material fact is genuinely disputed when there is "sufficient evidence favoring

the nonmoving party for a jury to return a verdict for that party."  *Id.* at 249 (citing *First Nat'l*

*Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)).

Summary judgment is not an opportunity for the Court to resolve factual disputes.

*Anderson*, 477 U.S. at 249.  The Court "must shy away from weighing the evidence and instead

view all the facts in the light most favorable to the nonmoving party and draw all justifiable

inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

## III. ANALYSIS

### A. ADA Discrimination

Under the ADA, employers cannot "discriminate against a qualified individual on the basis

of disability."  42 U.S.C. § 12112(a).  An employer's prohibited conduct under the ADA comes in

many forms, whether it be "hiring and firing" decisions (categorized as "adverse employment

decisions") or "not making reasonable accommodations" for a disabled employee.  *Hostettler v.*

*Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018) (citing 42 U.S.C. § 12112(a), 12112(b)(5)(A)).

Davis claims Defendants discriminated against her—thereby violating the ADA—by failing to

reasonably accommodate her disability, by moving her to unsuitable working conditions, and by

denying her the opportunity to return from FMLA leave.  While both a failure-to-accommodate

claim and an adverse employment decision-based claim fall under the umbrella of ADA

discrimination, courts evaluate them separately with slightly modified tests.  *See Thompson v.*

*Fresh Prods. LLC*, 985 F.3d 509, 525 (6th Cir. 2021) (evaluating each claim separately).

### 1. Failure to Accommodate

"In failure to accommodate cases, the plaintiff bears the initial burden of making out a prima facie case."[1] *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022). "If the plaintiff makes this showing, then the burden shifts to the employer to show that the accommodation would cause undue hardship for the employer." *Id.* (citing *Cleveland v. Fed. Express Corp.*, 83 F. App'x 74, 79 (6th Cir. 2003)).

To establish a prima facie claim for failure to accommodate, Davis must show that "(1) she was disabled within the meaning of the [ADA]; (2) she was otherwise qualified for her position, with or without reasonable accommodation; (3) the defendant knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the defendant failed to provide the necessary accommodation." *Id.* (quoting *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 669 (6th Cir. 2020)).  It is clear from the record that Davis is disabled, Defendants knew she was disabled, and Davis made multiple accommodation requests.[2]  Thus, the analysis turns on whether Davis was otherwise qualified for her position with or without reasonable accommodation and whether Defendants failed to provide the necessary accommodation.

### (a) Davis Was Otherwise Qualified for Her Position

Defendants argue that because Davis received SSDI benefits due to a "total disability," she must not be qualified to teach, even with accommodation.  They rely on the notion that a person

---

[1] As discussed below, courts apply different tests for ADA claims depending on whether there is direct or indirect evidence supporting discriminatory intent. *Hostettler*, 895 F.3d at 852.  Courts apply a version of the "direct evidence test to resolve failure to accommodate claims" because no inference is required to conclude that the employer's conduct is directly related to a plaintiff's disability. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)).

[2] Her medical conditions substantially limited one or more major life activity (*see* Davis Dep. 39), which constitutes a disability under the ADA.  42 U.S.C. § 12102(1)(A), 12102(2)(A).  Additionally, the KPS administrators responsible for providing ADA accommodations considered her disabled and knew about her medical conditions.  (*E.g.*, Emmons Dep. 89.)  Emmons treated her emails with doctors' notes as requests for accommodations.  (*Id.* at 46, 58, 63-64.)

deemed "totally disabled" for SSDI purposes cannot perform any work (*see* Davis Dep. 11), and caselaw stating that "a plaintiff's sworn assertion in an application for [SSDI] benefits that she is . . . 'unable to work' will appear to negate [this] essential element of her ADA case." *Stallings v. Detroit Pub. Schs.*, 658 F. App'x 221, 226 (6th Cir. 2016) (quoting *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)).  However, "an ADA plaintiff can survive summary judgment by explaining that [s]he can perform the essential functions of [her] position with a reasonable accommodation—a consideration the Social Security Administration's (SSA's) disability determination does not take into account." *Id.* (citing *Cleveland*, 526 U.S. at 807).  So, if Davis can perform the essential functions of her teaching position with a reasonable accommodation, she is a qualified individual.

First, the Court must determine whether Davis's proposed accommodations were reasonable.  An accommodation allows the individual to perform their job despite any limitations imposed by their disability.  *See Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (discussing whether a physician's proposed accommodation actually helped them treat patients).  That accommodation is reasonable if it "mak[es] existing facilities used by employees readily accessible to and usable by individuals with disabilities," or if it represents an "appropriate adjustment or modification[] of . . . policies" that already exist.  42 U.S.C. § 12111(9).  As discussed, Davis sought the opportunity to teach virtually, either with limited face-to-face contact with unvaccinated students or from her home.  KPS acknowledged that virtual teaching from a KPS building with limited face-to-face contact with unvaccinated students represented a reasonable accommodation.  (*E.g.*, Davis Dep. 49-50.)  But working fully from home was also a reasonable request.  KPS already made teachers' homes available as a facility from which they could teach (Davis Dep. 202), and KPS had policies in place that allowed teachers to teach from

home for long periods of time due to medical necessity (*e.g.*, Kirshman Dep. 98-100).  Allowing Davis to teach from home due to medical necessity is the kind of extension of existing facilities, and the kind of adjustment/application of existing policies, that constitutes a reasonable accommodation.

Next, the Court must determine whether Davis's reasonable accommodation (the virtual teaching discussed above) could allow her to perform the essential functions of her teaching position.  "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* (quoting *Rorrer*, 743 F.3d at 1039).  The ADA instructs courts to consider "the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions."  42 U.S.C. § 12111(8).  However, given the natural adjustments schools made during the COVID pandemic regarding virtual instruction, the typical sources defining the essential functions of Davis's teaching job provide less clarity.

Providing education to students is an obvious essential function of any teaching job.  And Davis was able to fulfill it with her reasonable accommodations.  Davis's supervisors indicated she was performing well as a virtual educator (*e.g.*, Kirshman Dep. 41), and neither her students in the virtual program nor their parents requested face-to-face instruction (*id.* at 167-68).  By all accounts, her ability to teach in the virtual program was unhindered, and her students appeared satisfied by her virtual performance.

KPS administrators also suggested that contributing to other faculty activities and participating in professional development exercises constituted an essential function of Davis's teaching job.  (*Id.* at 42-46.)  Assuming so, Davis was still able to perform this essential function

virtually.  In fact, KPS specifically granted her permission to attend faculty meetings and professional development opportunities virtually.  (Davis Dep. 91.)  She fulfilled this essential function of her job as well.

Viewing the facts in her favor, Davis could have worked virtually with limited face-to-face contact with unvaccinated students, or worked fully remotely from home, and she would have fulfilled the essential functions of her job.  Thus, she is qualified for her position with reasonable accommodations, and she has sufficiently explained the discrepancy between her SSDI application and her ADA claim.

### (b) Defendants Failed to Provide the Necessary Accommodation

As discussed above, Davis requested two different accommodations: virtual teaching with limited face-to-face contact with unvaccinated students and fully remote teaching from home.  She provided letters and notes from her medical providers illustrating that these accommodations were medically necessary.

There remains a question of fact as to whether KPS limited Davis's face-to-face contact with unvaccinated students while she was teaching virtually from KPS buildings.  Kirshman, the administrator for Oakwood, did not know whether the students in her building (some of whom school staff brought to Davis's classroom) were vaccinated.  (Kirshman Dep. 61.)  Emmons, who signaled to Davis that teaching out of Oakwood would prevent exposure to unvaccinated children (Emmons Dep. 43), did not know that students would be present at Oakwood when he established the purported accommodation (*id.* at 43, 51).  And when Davis transitioned to Winchell, administrators required her in-person attendance at an ice cream social in which the whole school attended.  (Davis Dep. 94-96.)  The record does not answer whether Davis's face-to-face contact with unvaccinated students was limited; questions of fact remain regarding whether KPS granted this accommodation Davis requested.  Additionally, KPS made clear that it would not

accommodate Davis's request to work fully remote from home even when doctors deemed it medically necessary.  (*E.g.*, Emmons Dep. 68 ("There was no work from home option for the district. . . . [I]t wasn't a possibility.").)  Thus, viewing the facts in Davis's favor, Defendants failed to provide Davis her necessary accommodations.  She has established each element of her prima facie case.

### (c) Accommodating Davis Would Not Present Undue Hardship

Because Davis established a prima facie case for her failure to accommodate claim, the burden shifts to Defendants to show that the accommodation would cause undue hardship for the employer.  "Even where . . . a plaintiff might be able to demonstrate a reasonable accommodation, a defendant can still be granted summary judgment[] if there are no genuine issues of material fact controverting the conclusion that the reasonable accommodation would impose an undue hardship on the employer."  *King*, 30 F.4th at 568.  But when the employer has policies in place showing that it offers the accommodation in other circumstances, the accommodation does not impose an undue hardship.  *See id.* (applying this logic to different types of medical leave).

Defendants have not met their burden on either of Davis's accommodation requests.  Given her placement in the virtual program, KPS could have provided Davis with her own space to teach that was isolated from any face-to-face student contact.  KPS has not shown that providing such space would cause an undue hardship, particularly when there were other KPS facilities with open space.  (D'Arcangelis Dep. 19-23.)  And KPS offered Davis's other requested accommodation— fully remote teaching from home—in other circumstances.  All KPS teachers taught fully remotely from home at the end of the 2019-2020 school year.  (Davis Dep. 34.)  All KPS teachers taught fully remotely from home for the 2020-2021 school year.  (*Id.* at 202; Emmons Dep. 32; Leland Dep. 22.)  And even when teachers returned, KPS maintained a policy that permitted teachers to work fully remotely from home if medically necessary.  (Kirshman Dep. 98-100.)  The ADA

acknowledges that some hardship may arise from an accommodation, but KPS had policies that planned for some teachers to work fully remotely from home.  Allowing Davis to teach from home—essentially taking advantage of a policy that KPS offered to its teachers—would not have presented an *undue* hardship to Defendants.

* * *

Davis satisfied the elements of her prima facie case.  She was disabled; she was otherwise qualified for the position with a reasonable accommodation; Defendants knew about her disability; she requested an accommodation; and Defendants failed to provide necessary accommodations. These accommodations would not have placed an undue burden on Defendants.  Thus, Davis's claim that KPS failed to provide reasonable accommodation under the ADA survives summary judgment.

### 2. Adverse Employment Decision-Based Discrimination

Davis claims KPS subjected her to two adverse employment decisions: moving her to unsuitable teaching spaces and denying her the opportunity to return from FMLA leave.  When a plaintiff alleges an adverse employment decision, "[t]here are two ways that a litigant can prove discrimination—directly or indirectly—each with its own test."  *Hostettler*, 895 F.3d at 852.  "The direct evidence test does not rely on the *McDonnell Douglas* burden-shifting framework." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007)).  Instead, the Court must use a multi-part test in which

> (1) The plaintiff bears the burden of establishing that he or she is disabled.  (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.  (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business

13

> necessity, or that a proposed accommodation will impose an undue hardship upon
> the employer.

*Id.*; *see also Hedrick v. W. Rsrv. Care Sys.*, 355 F.3d 444, 452-53 (6th Cir. 2004).  Courts apply the direct evidence test when "no inference is necessary to conclude that the employee has proven . . . discrimination."  *Kleiber*, 485 F.3d at 868.

Davis argues that Kirshman's apparent bias against providing ADA accommodations to virtual teachers constitutes direct evidence of discrimination.  Not so.  The Court would need to rely on inferences to conclude that Kirshman was involved in the decision to shift Davis's working space between KPS buildings, or that her apparent bias played a role in such decisions.  And the record indicates that Kirshman was not involved in the decision to deny Davis's return from FMLA leave.  Therefore, the direct evidence test is inappropriate for the adverse employment decisions Davis alleges.

"In the absence of direct evidence of discrimination, [the Court] appl[ies] the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), to evaluate workplace-discrimination claims."  *Thompson*, 985 F.3d at 522 (citing *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017)).  Davis must first establish a prima facie discrimination case by showing that (1) she was disabled; (2) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (3) she suffered an adverse employment decision due to her disability.  *Perry v. Am. Red Cross Srvs.*, 651 F. App'x 317, 325 (6th Cir. 2016).

As discussed above, Davis was disabled and was otherwise qualified to perform the essential functions of her job with reasonable accommodation.  However, she is unable to show she suffered an adverse employment decision.

For discrimination claims, "adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *O'Donnell v. Univ. Hosps. Cleveland Med. Ctr.*, 833 F. App'x 605, 620 (6th Cir. 2020) (internal citation omitted).  Notably, the "mere inconvenience or an alteration of job responsibilities" are "simply the type of complaints that arise in a difficult professional environment," and they are "not sufficient to constitute an adverse employment action." *Id.*

Davis first argues that placing her in an unsuitable working space was an adverse employment decision.  But she does not show how her unsuitable working spaces resulted in significantly different responsibilities or a significant change in benefits.  Instead, Davis frames this as KPS providing a space that fails to accommodate her disability—which the Court already addressed above—or KPS providing a space that leads to a hostile work environment—a claim that does not appear in her complaint.[3]  KPS shifting her working space was not an adverse employment decision that supports an ADA discrimination claim.

Next, Davis argues that KPS denying her the opportunity to return from FMLA leave amounts to an adverse employment action.  Once again, Davis frames this decision as a failure to accommodate; KPS only denied her the opportunity to return from FMLA because Defendants would not grant her request for reasonable accommodations.  The Court already determined that Davis's claim for a failure to accommodate survives summary judgment.  Davis has not shown

---

[3] A plaintiff "cannot assert new claims in response to summary judgment." *Tchankpa*, 951 F.3d at 817.  But even if Davis did bring a hostile work environment claim, she does not show how she was subjected to harassment, and KPS took corrective measures to provide a better working space once she raised her concerns.  (Davis Dep. 99-100, 115-17.)  Such corrective measures defeat her hostile working environment claim.  *See Trepka v. Bd. of Educ. of Cleveland*, 28 F. App'x 455, 460 (6th Cir. 2002) (explaining prima facie case).

facts that support a separate prima facie claim for discrimination;[4] she has only shown that KPS failed to provide a reasonable accommodation for her disability.

### B. ADA Retaliation

Davis claims Defendants retaliated against her for attempting to engage in the interactive process of seeking a reasonable accommodation under the ADA.  As discussed above, Davis has not shown any direct evidence of retaliation, so the Court proceeds under the *McDonnell Douglas* framework.  For retaliation claims, Davis must establish her prima facie case by demonstrating (1) she engaged in a protected activity; (2) Defendants knew she exercised a protected right; (3) Defendants took adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Wyatt*, 999 F.3d at 419.

Like her claims for discrimination, Davis frames Defendants' adverse action as failing to accommodate her disability.  Failure to accommodate constitutes a separate ground for an ADA violation; it is not an adverse action in and of itself.  And, as discussed above, because Davis has not resigned, her perpetual leave does not constitute a constructive discharge.  Davis has failed to demonstrate adverse action related to her protected activity; thus, her claim for retaliation under the ADA will be dismissed.

### IV. CONCLUSION

In the wake of the COVID pandemic, Davis became a teacher in KPS's virtual program. To accommodate her disability, Davis requested either a placement that limited face-to-face contact with unvaccinated students or the opportunity to teach from home.  It is unclear whether

---

[4] The complaint could—if read liberally—be construed as Davis claiming constructive discharge.  But Davis never resigned from KPS, she was never terminated, and she did not retire (Davis Dep. 145-46.), so a claim under constructive discharge would fail.  *Green v. Brennan*, 578 U.S. 547, 555 (2016) (holding that an employee "must also show that he actually resigned" to successfully bring a constructive discharge claim); *see also O'Donnell*, 833 F. App'x at 618 (explaining that if a plaintiff is on indefinite leave "with no apparent prospect of it being resolved satisfactorily, and the person ultimately resigns, *at that point* a constructive discharge can occur" (emphasis added)).

Defendants limited her face-to-face contact with unvaccinated students, and Defendants denied Davis's request to teach from home during the 2022-2023.  Defendants discontinued Davis's virtual teaching position for the 2023-2024 year, and have not reinstated her from leave because she seeks an accommodation to work from home.  In doing so, Defendants have failed to provide reasonable accommodations for Davis under the ADA.   However, because Davis has not demonstrated adverse action beyond the failure to accommodate, her separate discrimination claim and her retaliation claim will be dismissed.  Only Davis's failure to accommodate claim remains.

The Court will enter an order consistent with this Opinion.


Dated: June 30, 2025                              /s/ Hala Y. Jarbou
                                                  HALA Y. JARBOU
                                                  CHIEF UNITED STATES DISTRICT JUDGE